[No. 60167-9-I.   Division One.   Agust 11, 2008.]

Westlake View Condominium Association, *Appellant*, v. Sixth Avenue View Partners, LLC, et al., *Respondents*.

*Joseph Andrew Grube* (of *Ricci Grube Aita & Breneman, PLLC*), for appellant.

*Shellie McGaughey* and *Timothy E. Allen* (of *McGaughey Bridges Dunlap, PLLC*), for respondents.

¶1 BECKER, J. — A condominium homeowners' association sued the builder of the condos for breaching the implied warranty of habitability. The builder moved for summary judgment. The association presented evidence of regular water intrusion into the units, inadequately sloped decks, loose railings on decks, improperly installed windows, and other structural problems. Such evidence is sufficient to create a question of fact for the jury to determine whether the builder breached the implied warranty of habitability. Summary judgment for the builder is reversed.

¶2 Sixth Avenue View Partners built Westlake View Condominiums near Lake Union in 1999. Westlake has six units, two units on each of three floors. The two units on the top floor of the condominium have large decks that extend over the living areas of the units on the second floor.

¶3 The city of Seattle issued a certificate of occupancy on June 10, 1999. The six condos sold between June and September 1999.

¶4 Right away, the homeowners' association began notifying the builder, Rick Hunter, about construction problems with the condos. For example, the door leading to the deck had not been installed properly on unit 101, so the lock did not line up with the bolt and the owner was unable to lock the door. The deck on unit 201 did not have sufficient drainage, and as a result there were huge puddles on the deck after every rainfall. Hunter wrote back to the owner of unit 201 saying that he would ask his superintendent to look into the deck problems. The record contains no information as to any further communication that might have taken place between the homeowners' association and Hunter in the next few years.

¶5 The homeowners' association filed suit against Sixth Avenue in February 2004 for breach of contract, express warranties, and the implied warranty of habitability.

¶6 Several of the homeowners experienced ongoing water intrusion problems in their units. In March 2004, the association hired contractor McBride Construction to investigate how water was getting into the units. Following a two-day inspection, McBride prepared a report stating that water damage was evident in the interior wallboards of two units and in the structural framing of the deck surface and the deck handrail attachments on unit 301. The metal deck railing moved about 6 inches in and out when grasped. The report identified the visibly bowed and damaged window frames in all other units as another area of concern.

¶7 McBride identified several areas of poor workmanship that likely contributed to the water intrusion: poor installation of weather resistant barrier paper, poor installation of metal coping on the deck railing, and the failure to seal or properly shim the windows. The association sent Hunter a copy of the McBride report in April 2004. Hunter responded that he would have his construction superintendent review the report and make recommendations, but he believed that the condos were "out of warranty" and that "any repairs should be made through an insurance claim."

¶8 The association hired Bridge Planning Architecture to investigate the conditions of the building and develop a repair plan that was submitted in March 2005. Bridge was familiar with some of the building's water intrusion problems as it had responded to emergency leak conditions in units 201 and 301 on two separate occasions. Bridge sampled for mold in the units and did a selective destructive investigation in February 2005. Bridge reviewed and incorporated the McBride report into its findings and recommendations.

¶9 The Bridge report stated that the decks on the units were inadequately sloped to drain. The inadequate slope was said to be a factor contributing to the "persistent leaking condition into unit 201." Bridge recommended that the upper decks be rebuilt to provide the appropriate slope for drainage. The report noted that the deck columns were showing signs of excessive water intrusion. Bridge recommended stripping the siding and paper from the columns,

repairing the decay, and then applying weather resistant barrier. The deck railings on all units were "poorly set and sealed," a condition that contributed to the leaking in unit 201. Additionally, the railing was loose at the upper decks due to poor anchorage. Bridge recommended that the railings be removed and reset with proper materials to prevent water intrusion and further decay.

¶10  The Bridge report stated that the windows in most units "are experiencing deformation of the vinyl frame to a degree where failure of the window to perform is anticipated." Further, "[v]irtually every unit owner complains of excessive and recurring mold at the window sills and bottom sash of the glazed units themselves. The pervasive nature of this condition and the frequent recurrence of every 3-4 months (anecdotal) indicate a failure at the windows and a potentially pervasive life safety concern."

¶11  Bridge recommended that all windows be replaced, with proper flashing and seals. The report pointed out that the siding installed at the windows without sealant creates "a direct pathway for water to the window" and that there was evidence that water had been leaching from behind the siding. Mold was found on exposed sheathing and framing at exterior conditions, interior wall and ceiling cavities coincident with areas of water intrusion, interior gypsum behind base and door casing conditions where water intrusion was noted, and windows at every unit.

¶12  The report identified the building's seismic system as a potential area of concern. Bridge noted that there is a large crack running across the floor at the garage/basement level and that there is "noticeable cracking directly above the floor crack in the ceiling the full width span of the garage." There are cracks above the doors and nail heads popping through the ceiling in almost every unit. The report states, "If the seismic system is defectively installed it may represent a life safety hazard to the occupants." Completing the repairs recommended in the Bridge Report would cost approximately $341,000.

¶13 Sixth Avenue moved for summary judgment in September 2005 on the grounds that the plaintiff had failed to provide Sixth Avenue with the mandatory preclaim notice of 45 days prior to filing suit in violation of RCW 64.50.020. The trial court granted summary judgment. The plaintiff appealed. In July 2006, the Court of Appeals remanded the case back to the superior court based on a stipulated order in light of the Supreme Court's recent decision, *Lakemont Ridge Homeowners Ass'n v. Lakemont Ridge Ltd. Partnership*, 156 Wn.2d 696, 131 P.3d 905 (2006).

¶14 Sixth Avenue filed a second summary judgment motion to dismiss all of the plaintiff's claims on March 9, 2007. Sixth Avenue argued that it was entitled to judgment because the statute of limitations barred the plaintiff's claims. Additionally, Sixth Avenue claimed that the implied warranty of habitability claim was factually unsupported because the alleged defects did not involve fundamental foundation or support problems.

¶15 The trial court granted summary judgment to Sixth Avenue, dismissing all of the association's claims on April 6, 2007. The association moved for reconsideration of the dismissal of its implied warranty of habitability claim. The trial court denied this motion.

¶16 The homeowners' association appeals. The association contends that the trial court erred by dismissing its implied warranty of habitability claim on summary judgment.

¶17 Sixth Avenue responds that the statute of limitations bars the implied warranty of habitability claim. Sixth Avenue alleges that the homeowners discovered the construction defects in 1999 but failed to file a lawsuit until 2004.

¶18 Sixth Avenue did not argue in its motion for summary judgment that the statute of limitations had run on the association's claims. But Sixth Avenue contends that this argument was addressed at the summary judgment hearing. Neither party has submitted a transcript of the

hearing for our review on appeal. The date that the individual actions accrued would normally be a question of fact for the trial court. Because the record does not show that Sixth Avenue raised the issue of the statute of limitations as a bar to the claim of implied warranty of habitability in a timely fashion so as to permit the homeowners to show an issue of fact, the issue is not before this court on appeal.

¶19 The sole issue before this court is whether the homeowners made a record sufficient to warrant a trial on the issue of the implied warranty of habitability. Sixth Avenue claims that summary judgment was proper because the alleged defects do not involve fundamental building code violations or structural problems.

¶20 In reviewing an order of summary judgment, this court engages in the same inquiry as the trial court. *Atherton Condo. Apartment-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co.*, 115 Wn.2d 506, 516, 799 P.2d 250 (1990). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c).

¶21 In a summary judgment motion, the burden is on the moving party to demonstrate that there is no genuine issue as to a material fact and that, as a matter of law, summary judgment is proper. *Atherton*, 115 Wn.2d at 516. Any doubts as to the existence of a genuine issue of material fact are resolved against the moving party. We consider all the facts submitted and the reasonable inferences therefrom in the light most favorable to the nonmoving party. *Atherton*, 115 Wn.2d at 516.

¶22 *Atherton*, a 1990 decision, signaled a more homeowner-oriented analysis for implied warranty of habitability claims than had previously been used:

> In the sale of new residential dwellings, the doctrine of caveat emptor has properly been eroded by the winds of contemporary realities. *See generally McDonald v. Mianecki*,

79 N.J. 275, 283-91, 398 A.2d 1283 (1979); *Humber v. Morton*, 426 S.W.2d 554, 557-62 (Tex. 1968). The fictional foundation of the doctrine was aptly dispelled in *Chandler v. Madsen*, 197 Mont. 234, 642 P.2d 1028 (1982), where the Montana Supreme Court explained:

> *Caveat emptor*, which traditionally has applied to sales of real estate, developed at a time when a buyer and seller were in equal bargaining positions. They were of comparable skill and knowledge and each could protect himself in a transaction.
>
> In the modern marketplace that equality of position no longer necessarily exists, and a growing number of jurisdictions have abandoned *caveat emptor* in favor of implied warranties where a builder-vendor sells a new residence.

*Chandler*, at 238. This metamorphosis, as one court has observed, "brings the law much closer to the realities of the market for new homes than does the anachronistic maxim of caveat emptor." *David v. B&J Holding Corp.*, 349 So. 2d 676, 678 (Fla. Dist. Ct. App. 1977) (quoting *Gable v. Silver*, 258 So. 2d 11, 17 (Fla. Dist. Ct. App.), *cert. discharged*, 264 So. 2d 418 (Fla. 1972)).

The seminal case concerning implied warranties in the sale of new residential dwellings is *Carpenter v. Donohoe*, 154 Colo. 78, 388 P.2d 399 (1964). In *Carpenter*, the Supreme Court of Colorado held that builder-vendors of residential dwellings impliedly warranted that the homes they constructed complied with applicable building code requirements, were built in a workmanlike manner, and were suitable for habitation. *Carpenter*, at 83-84.

*Atherton*, 115 Wn.2d at 517-18 (footnote omitted).

■ ¶23 Washington has followed *Carpenter*[1] in abandoning the doctrine of caveat emptor as applied to the sale of new residential dwellings by builder-vendors and in recognizing an implied warranty. *House v. Thornton*, 76 Wn.2d 428, 457 P.2d 199 (1969). When a vendor-builder sells a new house to its first intended occupant, there is an implied

---

[1] *Carpenter*, 154 Colo. 78.

warranty " 'that the foundations supporting it are firm and secure and that the house is structurally safe for the buyer's intended purpose of living in it.' " *Atherton*, 115 Wn.2d at 518-19 (quoting *House*, 76 Wn.2d at 436).

¶24 In *Atherton*, owners of condominiums sued the builders and sought damages for the cost of repairing construction defects. The owners alleged that the construction company failed to build the condos in accordance with the city-approved building plans and the Uniform Building Code's (UBC) fire resistivity standards. *Atherton*, 115 Wn.2d at 513. Specifically, the builders had used "Kolor Krete," a stucco substitute product, on the exterior walls. It was not authorized in the plans and did not satisfy the UBC one-hour fire resistivity standard. *Atherton*, 115 Wn.2d at 512. The builders had also failed to use a one-half-inch plywood underlayment on the third floor, had not used gypsum on the inner surface of the mansard walls, had failed to construct adequate exits on the third floor, and had used unsafe, prefabricated fireplaces not depicted on the plans. The owners sued for implied warranty of habitability among other theories.

¶25 The builders moved for summary judgment, and the trial court granted their motion, concluding that "even if Atherton was not constructed in compliance with UBC fire resistivity standards, Owners did not have an actionable claim." *Atherton*, 115 Wn.2d at 514. The Court of Appeals affirmed, relying on *Stuart v. Coldwell Banker Commercial Group, Inc.*, 109 Wn.2d 406, 745 P.2d 1284 (1987). *Stuart* stated that the implied warranty of habitability applied only to "egregious defects in the fundamental structure of a home." *Stuart*, 109 Wn.2d at 416. The Court of Appeals reasoned, following *Stuart*, that the building code violations were serious and made the condos less safe during a fire than they should be, but they did not make the condos unfit for habitation on an everyday basis.

¶26 The Supreme Court criticized this reasoning as an "unnecessarily constrictive" reading of the implied warranty of habitability that *Stuart* had set forth and

instead stated that the applicability of the warranty should be on a "case-by-case basis." *Atherton*, 115 Wn.2d at 520. The facts of *Atherton* "clearly demonstrate the wisdom of applying the implied warranty of habitability to these circumstances." *Atherton*, 115 Wn.2d at 520. The claimed violations, if proved true, had the potential to severely restrict the habitability of the condominiums. The Supreme Court held that the alleged defects were "within the purview of the implied warranty of habitability and should not have been dismissed on summary judgment as a matter of law." *Atherton*, 115 Wn.2d at 522.

¶27 "The entire realm of defects which are within the purview of this implied warranty has not been precisely defined. Instead, '[a] more precise definition of the scope of this warranty must await delineation on a case by case basis.'" *Atherton*, 115 Wn.2d at 519 (alteration in original) (quoting *Yepsen v. Burgess*, 269 Or. 635, 641, 525 P.2d 1019 (1974)). One such delineation is found in *Burbo v. Harley C. Douglass, Inc.*, 125 Wn. App. 684, 106 P.3d 258 (2005). In that case, James Burbo bought a new house in June 2001. A month after the purchase, Burbo noticed a crack in the foundation wide enough to see daylight through. In November, cracks appeared in the concrete driveway. In December, water began leaking into the living room, damaging walls, flooring, carpet, and personal property. Later, snow came in through a defective seal around a bathroom skylight. And the front door did not fit. *Burbo*, 125 Wn. App. at 690. Burbo hired experts, who discovered several building code violations. Burbo complained to Douglass, the developer, and Douglass ordered some repairs by outside contractors. Other repairs were completed by Douglass employees.

¶28 Burbo found the quality of the repairs unacceptable and filed suit. Douglass characterized the defects as poor workmanship and the code violations as minor and therefore insufficient to trigger the implied warranty of habitability. *Burbo*, 125 Wn. App. at 690. The trial court dismissed Burbo's complaint on summary judgment, con-

cluding that the defects were beyond the scope of an implied warranty because the home was not totally unfit for habitation. *Burbo*, 125 Wn. App. at 691.

¶29 The question before the Court of Appeals was whether Burbo's description of the defects fell within the implied warranty of habitability. "Resolution of the dispositive element in such cases is frequently so highly fact-dependent that it is essentially a question of fact to be determined by the jury with careful instructions by the court." *Burbo*, 125 Wn. App. at 694. The court rejected the defendants' contention that a homeowner must have moved out of the house in order to prevail on an implied warranty of habitability. The court reversed the trial court's order granting summary judgment to the builders: "Here, the building code violations were not so serious as to force the occupants to evacuate. But neither were they trivial or aesthetic. . . . A jury could find that the fitness of the home was impaired and the implied warranty was breached." *Burbo*, 125 Wn. App. at 697.

¶30 The implied warranty of habitability does not cover alleged defects that involve mere defects in workmanship or aesthetic concerns. *Atherton*, 115 Wn.2d at 522. Sixth Avenue characterizes the problems related to the exterior decks, siding, and windows as "mere defects in workmanship." They claim the test is whether the evidence shows that the builder has deviated from the "fundamental aspects" of the building code. *See Atherton*, 115 Wn.2d at 522 n.10. Sixth Avenue argues that the report from Bridge detailing the problems with the condominiums and the repair efforts that are necessary is inadequate because the report did not specify the sections of the building code that were violated.

¶31 Sixth Avenue's attempt to use the building code as a litmus test to confine the types of cases that will fall under the protection of the implied warranty is inconsistent with *Atherton*. *Atherton* acknowledged that there are no bright-line tests. "The entire realm of defects which are within the purview of this implied warranty has not been precisely

defined." *Atherton*, 115 Wn.2d at 519. Many cases have been proved by showing building code violations because such violations are strong evidence, but we do not read *Atherton* as saying building code violations are indispensable to proof.

¶32 The problems with the Westlake View condominiums are similar to the problems found in both *Burbo* and *Atherton*. In *Burbo*, there was a crack in the foundation that daylight shone through, and rain and snow were penetrating the interior of the home. As in *Burbo*, the construction defects here, regardless of whether they violate building codes, are allowing water to infiltrate most of the units. The McBride and Bridge reports identified possible causes of the water intrusion, such as the failure to seal the windows or properly apply weather resistant barrier paper. The failure to properly install the windows has caused the frames to bow, necessitating the replacement of almost all the windows.

¶33 The association presented evidence that mold infestation is a problem in many of the units. While the plaintiff did not present any competent medical testimony below to link the owners' alleged health problems to mold growth in the condos, the mold at least demonstrates that water is getting into the units and causing property damage. Inadequate sloping of the decks to drain water and the loose railings on some of the decks make them unsafe places. Further, the crack in the floor in the garage may be indicative of structural problems. The defendants did not hire their own experts to rebut the plaintiff's reports detailing the construction defects in the homes. Whether these problems rise to the level of breaching the implied warranty of habitability is a question for the jury.

¶34 *Atherton* indicates that the implied warranty is intended to ensure that serious structural deficiencies will be fixed before major damage results. The condominiums do not have to degrade to a state where they are uninhabitable for this doctrine to apply. Rather, if the violations present a substantial risk of future danger, the implied warranty of

habitability is a viable claim. The homeowners do not have to wait until their windows cave in or portions of their decks rot off before the warranty applies.

¶35 We conclude the homeowners presented sufficient evidence of construction defects that are neither trivial nor merely aesthetic. When viewing the evidence in the light most favorable to Sixth Avenue, it supports a determination by a finder of fact that Sixth Avenue breached the implied warranty of habitability.

¶36 Reversed.

DWYER, A.C.J., and LAU, J., concur.