[No. 67216-9-I.   Division One.   October 8, 2012.]

LANDIS & LANDIS CONSTRUCTION, LLC, *Appellant*, v. NICOLA NATION, *Respondent*.

*Joseph A. Yazbeck, Jr.* (of *Yazbeck Cloran & Bowser PC*), for appellant.

*Jeffory E. Adams* (of *Murray Dunham & Murphy*), for respondent.

¶1 BECKER, J. — A construction crew encountered evidence of rodents the day they began moving into leased housing. They left without waiting for the problem to be resolved, and the construction company sued the landlord to recover prepaid rents. A rodent infestation evident at move-in represents an actionable breach of the implied warranty of habitability, justifying rescission of the rental agreement and immediate vacation of the premises. Because the tenant presented sufficient evidence to prove the presence of an actual or potential safety hazard, we reverse the order granting summary judgment to the landlord.

## FACTS

¶2 Nicola Nation owns a house in Bothell. She lived in it herself for three years before she began renting it out in 1998. In November 2009, Nation was contacted by a representative of Landis & Landis Construction. Landis needed a house for a construction crew to live in for a few months.

Nation agreed to rent the house on a short-term basis for $1,700 per month. On November 19, 2009, Landis foreman Cory Moore inspected the house with Nation and found it suitable. Moore and Nation completed and signed a move-in checklist. Nation gave Moore the keys. A lease was signed. Landis paid Nation $2,437 in rent for the remainder of November and all of December, as well as a security deposit and a utility deposit.

¶3  On November 23, 2009, the Landis crew began moving into the house. According to statements by Landis personnel, the crew smelled a strong "dead animal" odor in the house. One crew member went out and bought an air freshener to mask the odor, but the smell persisted. As the crew unpacked their belongings, they found rodent feces and poison in the kitchen and pantry. In the backyard and under the deck, they found food wrappers that had been ripped into tiny pieces. Believing the house was infested by rodents, the crew left.

¶4  Moore immediately reported the problem to Nation, told her that Landis could not expose its employees to the danger of a rodent infestation, and asked for a refund. According to Moore, Nation admitted there had previously been rats in the house due to a previous renter's food garbage but she said she believed she had eradicated the problem.

¶5  Nation went to the house to inspect for rodents and put out poison and traps. According to Nation, she did not observe any evidence of rodents before the Landis crew moved in or after they departed.

¶6  Nation refunded the deposits, but she refused to return the prepaid rent based on a lease provision that made Landis responsible, in the event of an early departure, for paying rent until another tenant moved in. A new tenant moved in on January 1, 2010.

¶7  Landis sued for return of rent. The trial court granted Nation's motion for summary judgment dismissal and

awarded attorney fees. Landis appeals, arguing that Nation breached an implied warranty of habitability contained in the rental agreement.

## THE IMPLIED WARRANTY OF HABITABILITY IS INDEPENDENT OF THE RESIDENTIAL LANDLORD TENANT ACT OF 1973

¶8 Nation contends there is no implied warranty of habitability in rental housing independent of the Residential Landlord-Tenant Act of 1973, chapter 59.18 RCW.

¶9 The act went into effect in July 1973. LAWS OF 1973, 1st Ex. Sess., ch. 207. The act imposes on landlords a general duty to "at all times during the tenancy keep the premises fit for human habitation." RCW 59.18.060. It affords tenants a way of compelling landlords to remedy certain unsafe conditions in leased residential premises, and it specifically mentions the landlord's duty to provide a reasonable program for the control of infestation by pests. RCW 59.18.060(4). Upon notice, the landlord is obliged to take swift action—between 1 and 10 days, based on the type of risk to the tenant—to remedy the defective condition. RCW 59.18.070.

¶10 The landlord can take even longer than 10 days if the defect is "so substantial that it is unfeasible for the landlord to remedy the defect within the time allotted." RCW 59.18.120. In the latter case, the tenancy may be terminated by court order. RCW 59.18.120. In all other cases, tenants pursuing action within the statutory scheme remain in the tenancy while the landlord carries out the needed repairs. If the landlord fails to carry out repairs within the allotted time frame, the tenant then has the option to terminate the rental agreement and "quit the premises." RCW 59.18.090(1).

¶11 Nation contends that Landis had to proceed under the Residential Landlord-Tenant Act and give her notice and an opportunity to eliminate the rodents before suing for

breach of contract. She argues that the Residential Landlord-Tenant Act superseded common law remedies.

¶12 The act did not supersede common law remedies. By its plain language, the act preserves other tenant remedies against a landlord. The statutory notice and remedy process is provided to the tenant "in addition to pursuit of remedies otherwise provided him or her by law." RCW 59.18.070. A tenant may premise an action against a landlord under any of three legal theories: the act, the rental agreement, or the common law. *Dexheimer v. CDS, Inc.*, 104 Wn. App. 464, 467, 470, 17 P.3d 641 (2001).

¶13 One common law theory available to a tenant is the implied warranty of habitability. Our Supreme Court first recognized this theory in October 1973, three months after the Residential Landlord-Tenant Act went into effect, in *Foisy v. Wyman*, 83 Wn.2d 22, 515 P.2d 160 (1973). In *Foisy*, the tenant argued that the landlord's violation of an implied warranty of habitability excused his failure to pay rent and provided him an affirmative defense to the landlord's unlawful detainer action. The court agreed, reasoning that any "realistic analysis of the lessor-lessee or landlord-tenant situation leads to the conclusion that the tenant's promise to pay rent is in exchange for the landlord's promise to provide a liveable dwelling." *Foisy*, 83 Wn.2d at 27. The court held that "in all contracts for the renting of premises, oral or written, there is an implied warranty of habitability" and that breach of this implied warranty could be employed by the tenant as a defense to unlawful detainer. *Foisy*, 83 Wn.2d at 28. The court's belief that "public policy demands such a result" was "reinforced" by the new statute. *Foisy*, 83 Wn.2d at 28. Because the act and the *Foisy* decision developed independently, "we cannot presume that the Legislature intended the act to restrict application of the implied warranty of habitability." *Aspon v. Loomis*, 62 Wn. App. 818, 825, 816 P.2d 751 (1991), *review denied*, 118 Wn.2d 1015 (1992).

¶14 Nation contends that the implied warranty of habitability is available only in disputes that arose before the

Residential Landlord-Tenant Act went into effect and also that the implied warranty is limited to the context of unlawful detainer. Nothing in *Foisy* indicates such limitations.

¶15 Nation contends the act was intended to modify and supersede the implied warranty of habitability found in *Foisy*. Because the act preceded *Foisy*, this contention is inaccurate. Nation relies on an opinion that states, erroneously, that the implied warranty of habitability governed Washington tenancies even prior to the adoption of the act and that the act "codified" the implied warranty of habitability. *Howard v. Horn*, 61 Wn. App. 520, 524, 810 P.2d 1387 (1991). The erroneous chronology in *Howard* originated in a misleading statement in an earlier case, where the court implied that the legislature was following the "lead" of *Foisy* when it enacted the Residential Landlord-Tenant Act. *Lincoln v. Farnkoff*, 26 Wn. App. 717, 719-20, 613 P.2d 1212 (1980). The legislature may have been following a general trend in the law, but obviously the legislature was not following the lead of *Foisy*, which had not yet been decided.

¶16 In short, the implied warranty of habitability recognized in *Foisy* has not been superseded by statute. The implied warranty of habitability recognized in *Foisy* is available to a tenant as a basis for legal action against a landlord under the common law, independent of the Residential Landlord-Tenant Act.

## NOTICE AND OPPORTUNITY TO CURE

¶17 Nation next contends that a defective condition cannot be an actionable breach of the implied warranty of habitability until the landlord receives notice of the alleged defect and fails to remedy it after a reasonable time. Nation supports this argument by citing *Franklin v. Fischer*, 34 Wn.2d 342, 348-49, 208 P.2d 902 (1949), a case from the era of caveat emptor.

¶18 In *Franklin*, lessees of a commercial property claimed the landlord had breached an express covenant to

keep the water supply and roof in repair. Their claims for damages were denied because the lessors made the repairs as rapidly as possible after being notified of the problem. *Franklin*, 34 Wn.2d at 348-49. *Franklin*, however, does not apply because it pertains to a commercial lease and, as well, because it predates *Foisy*.

¶19 A treatise cited by Nation addresses in general terms what amounts to a breach of the implied warranty. Nation relies on the author's statement, "it would seem that the landlord should not be deemed to be in breach of his duty unless he fails to make the necessary repairs within a reasonable time after receiving notice . . . ." WILLIAM B. STOEBUCK & DALE A. WHITMAN, THE LAW OF PROPERTY § 6.38, at 307 (3d ed. 2000).

¶20 But Nation omits the remainder of the sentence, which reads "—at least where the defective condition(s) only arise, or become patent, after the tenancy begins." Here, the evidence of rodent infestation was patent at move-in. Thus Professor Stoebuck's statement does not mean that Landis had to wait upon Nation's efforts at extermination in order to have an actionable claim. There was no evidence that the presence of rodents was due to conduct by the Landis crew.

¶21 The Supreme Court of Hawaii has persuasively rejected the argument that a new tenant who encounters a rodent infestation on the first day of the tenancy must endure the infestation while waiting for the rodents to be eliminated:

> While it is not clear where the rats came from, assuming that they did originate from outside of the premises, the defendant had it within her power to keep them out by proper and timely screening and extermination procedures. Indeed this was done before the next tenant moved in. But to begin such procedures after the plaintiff had occupied the dwelling and to expect that he have the requisite patience and fortitude in the face of trial and error methods of extermination was too much to ask.

*Lemle v. Breeden*, 51 Haw. 426, 462 P.2d 470, 475 (1969). Consistent with *Foisy*, *Lemle* adopted the view that "a lease is essentially a contractual relationship with an implied warranty of habitability and fitness," so that a tenant may resort to "basic contract remedies of damages, reformation, and rescission" instead of being constrained by rigid rules originating in the law of property. *Lemle*, 462 P.2d at 475.

¶22 Nation notes that in *Lemle*, the tenants stayed in the rat-infested rental for three days and vacated the premises only after the landlord's early attempts to get rid of the rats failed. But the *Lemle* court did not hold that the tenants' right to relief depended upon giving the landlord time to fix the problem. Rather, the court said that each case "must turn on its own facts." *Lemle*, 462 P.2d at 476. Taking into consideration "the seriousness of the claimed defect and the length of time for which it persists" as relevant factors, the court concluded the evidence was sufficient to support judgment for the tenants. *Lemle*, 462 P.2d at 476.

¶23 Similarly here, we conclude there is sufficient evidence for a trier of fact to find a material breach of the implied warranty of habitability, justifying rescission of the rental agreement and immediate vacation of the premises. The decision by Landis to move out immediately without giving Nation a chance to address the problem was not fatal to the claim.

## RODENTS ARE A POTENTIAL SAFETY HAZARD

¶24 Nation contends the appropriate standard of habitability is whether the dwelling is "actually unfit to be lived in," as stated by this court in *Wright v. Miller*, 93 Wn. App. 189, 200-01, 963 P.2d 934 (1998) (defective handrail that did not run the full length of stairwell did not render the dwelling unfit to be lived in), *review denied*, 138 Wn.2d 1017 (1999). Landis contends the standard is less imposing: whether the condition creates an "actual or potential safety hazard" to the occupants. *Lian v. Stalick*, 106 Wn. App. 811,

818, 25 P.3d 467 (2001), citing *Atherton Condo. Apartment-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co.*, 115 Wn.2d 506, 519-22, 799 P.2d 250 (1990).

¶25 Landis is correct; the *Atherton* standard is the current rule. *See Westlake View Condo. Ass'n v. Sixth Ave. View Partners, LLC*, 146 Wn. App. 760, 771-72, 193 P.3d 161 (2008). Under *Atherton*, "if the violations present a substantial risk of future danger, the implied warranty of habitability is a viable claim." *Westlake*, 146 Wn. App. at 771-72. The absence in *Wright* of any reference to the *Atherton* standard was likely due to the fact that the counterclaim at issue in *Wright* was "based on an alleged breach of the statutory warranty of habitability, not on the rental agreement or the common law." *Wright*, 93 Wn. App. at 200. The claim in *Atherton* was based on the common law implied warranty of habitability.

¶26 There is no doubt that a rodent infestation can create an actual or potential safety hazard. *See Apostle v. City of Seattle*, 70 Wn.2d 59, 65, 422 P.2d 289 (1966) (referring to the "ever-present danger of disease transmission" that accompanies a rodent infestation).[1]

## EXISTENCE OF GENUINE DISPUTE

¶27 Nation contends the evidence before the trial court was not sufficient to take the case to a jury. She points out that the move-in checklist signed by Moore, the Landis foreman, does not mention rodent issues.

¶28 The checklist is not dispositive, particularly in light of Moore's declaration that the day he inspected the house it "smelled strongly of cleaning supplies," which could have masked a rodent odor. And a clean inspection on any given day has limited value in proving the nonexistence of

---

[1] Nation has moved under RAP 9.12 to strike four Internet articles about rodent infestation cited in the appellant's reply brief and has asked to have sanctions imposed under RAP 10.7. We have not considered the articles and therefore do not address the motion to strike. We deny the request for sanctions.

an infestation where there is other substantial evidence of rodent activity.

¶29  To show that there was no significant rodent problem, Nation relies primarily on her own self-serving declaration. She says she and her husband lived in the house for 3 years in the 1990s without any rodent problems. She received only a single complaint regarding rodents in more than 10 years of renting the house to tenants. That complaint, in December 2008, reported rodents entering the house through the laundry vent in the pantry. She swiftly addressed the problem and heard no further complaints. She and her husband observed no rodent problems when they cleaned and painted the house in October and November 2009 before the Landis crew moved in. After Landis complained, they placed traps and poison, which were undisturbed. And her current tenant has made no rodent complaints.

¶30  On review of summary judgment we take the facts and reasonable inferences from those facts in the light most favorable to the nonmoving party. *Michak v. Transnation Title Ins. Co.*, 148 Wn.2d 788, 794, 64 P.3d 22 (2003). Facts contradicting Nation's version are found in Moore's declaration. He described the evidence of infestation on the day the crew attempted to move in. He described a strong "dead animal" odor emanating from the basement, visible rodent droppings in the kitchen and pantry, and food wrappers torn into tiny bits in the backyard. Correspondence between Nation and a Landis executive assistant soon after the crew moved out corroborates Moore's claim that the crew members left the rental because they perceived an infestation.

¶31  The implied warranty of habitability does not cover trivial or aesthetic concerns. *Atherton*, 115 Wn.2d at 522. It must be left to a trier of fact to determine whether the rodent problem in Nation's rental house was trivial, as she contends, or whether it met the *Atherton* standard of a condition presenting a substantial risk of future danger. We conclude Landis produced sufficient evidence to rebut Na-

tion's declaration and defeat her motion for summary judgment.

¶32 The rental agreement provides for an award of attorney fees to the prevailing party. Reversal of summary judgment also requires reversal of the trial court's award of attorney fees to Nation. Landis requests an award of attorney fees for prevailing on this appeal. An award of attorney fees under a "prevailing party" lease provision is premature until a party prevails on the merits. *Indigo Real Estate Servs., Inc. v. Wadsworth*, 169 Wn. App. 412, 426-27 & n.11, 280 P.3d 506 (2012). Attorney fees incurred for this appeal shall be included in any award ultimately made to the party who prevails at trial.

¶33 Reversed.

Cox and SCHINDLER, JJ., concur.

Reconsideration denied November 16, 2012.

Review denied at 177 Wn.2d 1003 (2013).