FILED
COURT OF APPEALS
DIVISION II

2014 SEP 23 AM 9: 33

STATE OF WASHINGTON

BY_____
DEPUTY

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| ERIC and SUSIE KIM, a married couple, | No. 44430-5-II |
| Appellants, | |
| v. | UNPUBLISHED OPINION |
| SHELLY and JOHN DOE FOREST, | |
| Respondents, | |
| And | |
| RE MAX PARKSIDE; BECKIE and JOHN DOE STEPHENS and their marital community; and JOHN DOES 1-5, | |
| Defendants. | |

BJORGEN, A.C.J. — Eric and Susie Kim appeal an order dismissing on summary judgment their suit against Shelly Forest for fraud, negligent misrepresentation, and breach of contract, arising out of moisture problems the Kims experienced in the new home they purchased from Forest. The Kims argue that genuine issues of material fact remain as to whether Forest installed a drainage system as promised in an addendum to the purchase and sale agreement (Agreement) and whether Forest engaged in fraud or negligent misrepresentation with respect to that system. The Kims also appeal from the trial court's imposition of sanctions under Civil Rule (CR) 11 against their attorney, contending that their suit had a sufficient factual basis, that their attorney conducted a reasonable inquiry into the underlying facts, and that they did not file the suit for any improper purpose.

Because the Kims presented no evidence to the trial court that Forest made a false statement of material fact, and a one-year warranty limitation in the Agreement forecloses their breach of contract claim, we affirm the grant of summary judgment to Forest. Because the

imposition of sanctions against their attorney did not substantially affect the Kims' rights or interests, and their attorney did not appeal the trial court's CR 11 order, we decline to consider the sanctions imposed.

## FACTS

The Kims made an offer to purchase a house, then under construction, from Forest in January 2006. The Kims' agent prepared the Agreement using preprinted Northwest Multiple Listing Services forms with handwritten modifications. The Agreement included a "pre-closing inspection" clause and an exclusive construction warranty limited to one year. Clerk's Papers (CP) at 56-59.

The Kims hired licensed professional inspector Kim Martin to inspect the house before closing. Among other problems, Martin noted standing water in the crawl space and "[r]ecommend[ed that] this condition be resolved prior to closing." CP at 130. Martin's report, dated March 27, 2006, also

> recommended that any deficiencies noted in the report and the components/systems related to these deficiencies be evaluated, inspected and repaired as needed by licensed contractors/professionals PRIOR TO THE CLOSE OF ESCROW. Further evaluation PRIOR to the close of escrow is [also] recommen[d]ed s[o] a properly licensed professional can evaluate our concerns further and inspect the remainder of the system or component for additional concerns that may be outside our area of expertise or the scope of our inspection.

CP at 136. Finally, Martin's report contained the following advisement:

> Structure has full or partial basement: Any basement may be susceptible to water penetration, especially when there are unprotected stair wells or window wells . . . . Any water runoff conditions related to roof, soil or hard surfaces should be directed to a drainage contractor for evaluation. Follow up with the seller to determine if there is any past history of water in the basement, how it was mitigated and if further evaluation by a specialist is needed.

CP at 139.

2

The Kims performed a "before-closing walk through inspection" with Forest on March 27. CP at 76-77, 121. Following this inspection they addressed the moisture issue, along with other deficiencies Martin had noted, in an addendum to the Agreement:

> Moisture in crawlspace will be eliminated by Stem wall was just done 3/25 water was used by builder, will dry. French drain will be installed.
> . . . .
> If within warranty period, crawlspace continues to retain moisture, builder will remedy.

CP at 77. On March 29, the Kims and Forest agreed that

> Buyers [are] to confirm the completion of these items[, including the drainage system] Friday March 31, 2006 at 11[ ]a.m. so that closing can proceed as scheduled. In the event that not all of [the agreed changes] are completed, buyer and seller will determine a date of closing not to exceed one week of this addendum.

CP at 121. The sale closed as scheduled on March 31, 2006. The Kims apparently moved into the house immediately after closing and subsequently made various improvements to the grounds.

A little over two years later, in November or December 2008, the Kims discovered that moisture had entered their basement and damaged the drywall and wood trim. They filed a claim with their homeowner's insurance carrier, and the insurer sent licensed professional engineer Zdenek Trnka to investigate the problem.

Trnka confirmed that water had seeped into the basement, observed some standing water in the crawl space, and "did not see any conclusive evidence of the existence of a footing drain system." CP at 141. Trnka concluded that the problem resulted from a "construction defect, possibly combined with a design defect," opining that "[t]he standing water is also an indication that the footing drain system is non existent or has failed." CP at 142. Trnka did not state that

3

he had carried out any excavation or testing to determine whether Forest had installed a drainage system, but based his conclusions on visual observations and moisture meter readings alone.

After receiving Trnka's report, the insurer denied the Kims' claim. The Kims subsequently hired professional engineer Roddy Nolten to investigate the cause of the water seepage, assess the damage, and recommend remedial measures. Nolten's report listed the following "conclusions":

> a. The sub grade was not prepared as customary in construction, using crushed rock sand & a waterproof membrane.
> b. Was wire mesh installed in the slab to prevent cracking?
> c. If footing drains were installed, were they inspected to be clear of debris and able to drain?
> d. Was the entire drainage system . . . inspected for proper installation?
> e. Was a waterproof coating applied to the concrete basement walls?
> f. From previous experiences it was determined, that a substandard drainage system was the cause of the water problems.

CP at 168. Nolten also did not excavate any material or conduct any test to determine whether a drainage system existed, but based his conclusions entirely on visual observations. The Nolten report concluded with various recommendations, including the following:

> •Unearth the footing drains to see if they are functioning properly. If not, clean and repair pipes etc.
> •Determine where the footing and roof drains lead to; if a French drain was installed, it could possibly be inadequate. Have a civil drainage engineer verify or redesign an adequate system.
> •Check City inspection records for installed drainage and concrete slab installation.

CP at 168. The record does not indicate whether the Kims followed any of these recommendations.

4

No. 44430-5-II

The Kims obtained an estimate of $49,316.16 from contractor Alaxs Kim[1] for the cost of the repairs. In a subsequent sworn declaration, Alaxs Kim gave the following opinion as to the cause of the problem:

> there was a construction and design defect in the way in which the Contractor installed the drain system. It appears that the drain system was never installed and nor did they provide water sealer on the foundation wall to prevent water intrusion nor did they provide any water resistant seals on the footing. The Contractor also did not route the drain under the house properly to allow to drain properly.

CP at 173. The declaration did not, however, describe any basis for these opinions other than visual inspection.

The Kims filed suit against Forest in May 2009, claiming intentional misrepresentation through fraud/deceit, negligent misrepresentation, and breach of contract.[2] The Kims specifically alleged in support of their misrepresentation claims that (1) they had "entered into a contract to purchase the property . . . on the condition that [Forest] installed a proper draining system"; (2) that Forest "made statements and representations to the Kims that a proper draining system had been installed"; (3) that "there was not a proper draining system to allow the water to drain properly"; (4) that Forest "had knowledge of the falsity of [her] claims, or showed a reckless disregard for the truth in [her] successful efforts to induce the plaintiffs into purchasing the subject property"; and (5) that their "right to rely on the assertions of [Forest's] statement and assertions were valid and justified because [Forest was] in a superior bargaining position, and had knowledge about the subject that the [Kims] could not be made aware of outside of an

---

[1] The record does not disclose any familial relationship between Alaxs Kim and the Kims.

[2] The Kims also sued Forest's real estate agent and the company that employed the agent, claiming professional negligence and violation of the Consumer Protection Act, chapter 19.86 RCW. The Kims apparently settled those claims, and the parties do not contend they have any bearing on the issues in this appeal.

5

independent examination or the passage of time." CP at 277-80. With respect to the breach of contract claim, the Kims alleged that Forest "materially breached the contract by failing to meet the conditions set forth in the contract." CP at 280.

The Kims moved for summary judgment. Before the hearing on the Kims' motion, Forest submitted declarations from several people with personal knowledge, including herself, attesting to the installation of a foundation drainage system and "French drain" at the Kims' house. CP at 288, 292-96. Forest informed the Kims that she would seek sanctions under CR 11 should the Kims continue to prosecute the suit. Forest pointed out that she had adduced direct evidence from competent witnesses with personal knowledge establishing the existence of a drainage system, while the Kims, despite the fact that "a simple investigation could prove the presence or absence of a drain system," had presented only speculation that the system may not exist. CP at 239. The Kims refused to dismiss the action. The trial court denied the Kims' motion for summary judgment.

In October 2012, Forest sent licensed professional engineer Trent Lougheed, along with a plumber, to investigate the problem with the drain system at the Kims' house. The plumber inserted a camera into the exposed drain pipe in the crawl space and made a video showing the condition of the drain system. Based on the images, Lougheed and the plumber ascertained that the system had stopped functioning because the drain pipe had become partially crushed and "plugged with mud" about "14 feet downhill from the location where the French drain entered the foundation drain line." CP at 86, 229. The plumber marked the location on the ground beneath which the line had become blocked. In his sworn declaration, Lougheed stated that he could not determine the cause of the blockage without excavating the clogged portion of the

pipe, and opined that, in other respects, "the foundation appeared to be sound, intact, and properly constructed." CP at 86-87.

Forest then moved for summary judgment and to strike portions of declarations submitted by the Kims that Forest asserted amounted to speculation or were not based on personal knowledge. Forest also moved for an award of attorney fees under a fee-shifting provision in the Agreement, and for sanctions under CR 11.

The court granted Forest's motion to strike, because portions of the declarations submitted by the Kims, including most of Nolten's "conclusions," were not factual statements and because the declarants lacked sufficient personal knowledge to assert other portions in that they did not claim to have inspected the subsurface conditions. The court then granted Forest's motion for summary judgment, ruling that the Kims' evidence failed to establish a dispute as to the existence of the drain system or whether Forest made any false statement of material fact, and that the one-year warranty provision foreclosed their claim regarding any alleged defect in the drain system.

Following a subsequent hearing, the trial court granted Forest's request for attorney fees and CR 11 sanctions. The court concluded that "[t]he failure to make a reasonable investigation of the contested facts before prosecuting the claims of the Kims was a violation of Civil Rule 11" and that "a reasonable sanction for the violation is to require [the Kims' attorney] to make payment of the attorney's fees and costs incurred by Forest after he was warned by Forest of her intent to seek Civil Rule 11 sanctions." CP at 273.

The Kims timely appealed. Their attorney, however, did not file a notice of appeal in this matter concerning the imposition of sanctions.

7

ANALYSIS

After setting forth the standard of review, we first consider the Kims' claim that the trial court erred in granting Forest's summary judgment motion. Concluding that summary judgment was proper, we then turn to the trial court's imposition of sanctions under CR 11. Finally, we address Forest's request for attorney fees and sanctions on appeal.

I. STANDARD OF REVIEW

We review a grant of summary judgment de novo and perform the same inquiry as the trial court. *Macias v. Saberhagen Holdings, Inc.*, 175 Wn.2d 402, 407-08, 282 P.3d 1069 (2012). A party moving for summary judgment bears the burden of demonstrating that there is no genuine issue of material fact. *Atherton Condo. Apartment-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co.*, 115 Wn.2d 506, 516, 799 P.2d 250 (1990). If the moving party satisfies its burden, the nonmoving party must present evidence demonstrating that a material fact is in dispute. *Atherton*, 115 Wn.2d at 516. If the nonmoving party fails to do so, then summary judgment is proper. *Vallandigham v. Clover Park Sch. Dist. No. 400*, 154 Wn.2d 16, 26, 109 P.3d 805 (2005).

A trial court should grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). A material fact is one upon which the outcome of the litigation depends in whole or in part. *Atherton*, 115 Wn.2d at 516.

Summary judgment is proper only if reasonable persons could reach but one conclusion from all the evidence. *Vallandigham*, 154 Wn.2d at 26. In reviewing a summary judgment, we

consider all facts, and the reasonable inferences therefrom, in the light most favorable to the nonmoving party, here, the Kims. *Vallandigham*, 154 Wn.2d at 26; *Atherton*, 115 Wn.2d at 516.

## II. THE TRIAL COURT'S GRANT OF SUMMARY JUDGMENT TO FOREST

In support of their claim that the trial court erred in dismissing their suit on summary judgment, the Kims argue (1) that "[g]enuine issues of material fact are still in dispute in this case regarding whether [Forest] properly installed the drainage system"; (2) that Forest breached the contract because she "promised to repair the water problem found on the inspection report and she failed to do so"; (3) that the one-year limitation on the construction warranty in the Agreement was invalid because it was not supported by consideration; (4) that the problem with the drain system fell within the implied warranty of habitability, and the "economic loss rule" therefore did not limit Kims' remedy to the negotiated warranty; (5) that, under the discovery rule, the warranty period did not begin to run until the Kims discovered the water damage; and (6) that "[i]t is obvious that fraud was established by the [Kims]." Br. of Appellant at 11-21. We find none of these arguments persuasive.

A.  Fraud/Negligent Misrepresentation

To establish their claim of fraud or intentional misrepresentation, the Kims had to establish each of nine elements by clear, cogent, and convincing evidence:

> (1) a representation of existing fact, (2) its materiality, (3) its falsity, (4) the speaker's knowledge of its falsity, (5) the speaker's intent that it be acted upon by the person to whom it is made, (6) ignorance of its falsity on the part of the person to whom the representation is addressed, (7) the latter's reliance on the truth of the representation, (8) the right to rely upon it, and (9) consequent damage.

*Elcon Constr., Inc. v. E. Wash. Univ.*, 174 Wn.2d 157, 166, 273 P.3d 965 (2012). Similarly, to prevail on their claim of negligent misrepresentation, the Kims had to prove by clear, cogent, and convincing evidence

9

"(1) That [Forest] supplied information for the guidance of others in their business transactions that was false; and

(2) That [Forest] knew or should have known that the information was supplied to guide [the Kims] in business transactions; and

(3) That [Forest] was negligent in obtaining or communicating false information; and

(4) That [the Kims] relied on the false information supplied by [Forest]; and

(5) That [the Kims'] reliance on the false information supplied by [Forest] was justified (that is, that reliance was reasonable under the surrounding circumstances ); and

(6) That the false information was the proximate cause of damages to [the Kims]."

*Lawyers Title Ins. Corp. v. Baik*, 147 Wn.2d 536, 545, 55 P.3d 619 (2002) (quoting *ESCA Corp. v. KPMG Peat Marwick*, 135 Wn.2d 820, 827-28, 959 P.2d 651 (1998)) (emphasis omitted). Thus, to prevail under either theory, the Kims had to show that they could establish by clear, cogent, and convincing evidence at trial that Forest had told them something false.

Affidavits on summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." CR 56(e). Mere allegations, suppositions, unsupported opinions, and bare legal conclusions do not suffice to establish a factual dispute. *Grimwood v. Univ. of Puget Sound, Inc.*, 110 Wn.2d 355, 359-60, 753 P.2d 517 (1988).

The only relevant representations Forest made in the Agreement were that the "[m]oisture in crawlspace will be eliminated" and a "French drain will be installed." CP at 77. The Kims never alleged that Forest made any other specific factual statement concerning the drainage system.

As discussed, to sustain their fraud claim, the Kims had to show that they could produce admissible evidence that Forest had made a false statement of *existing* fact. With respect to allegations of fraud, "a false promise does not constitute the representation of an existing fact." *Adams v. King County*, 164 Wn.2d 640, 662, 192 P.3d 891 (2008) (citing *Stiley v. Block*, 130

10

Wn.2d 486, 505-06, 925 P.2d 194 (1996)). The statements relied upon consist of promises of future performance. Thus, even if proven false, they would not as a matter of law give rise to a valid fraud claim.

Furthermore, even viewed in the light most favorable to the Kims, the record provides no reason to doubt the truth of either statement. The Kims do not assign error to the trial court's order striking their experts' speculative "conclusions." The only evidence adduced of a problem with the drain system was the fact that it did not function properly approximately two years after its installation. To assert from this evidence that the system did not function properly when installed amounts to pure speculation.

On the other hand, Forest submitted a declaration from an expert, supported by video evidence, establishing that she did install a French drain, as well as declarations from persons with direct knowledge who saw the entire drainage system before it was buried. The speculation by the Kims' experts that the absence of a proper drainage system may have caused the moisture problem does not raise any issue as to the existence of the French drain.

The only competent evidence on the point properly before us is the Trnka report and declaration, which established only that there was a problem approximately two years after the installation and that the "standing water is also an indication that the footing drain system is non existent or has failed." CP at 142. If Forest installed a drain system that later failed, even if due to a defect in design, materials, or workmanship, the Kims' fraud claim also fails: to establish fraud, the Kims needed to show that they could produce "clear and convincing evidence" at trial that Forest made a false statement that she knew to be false.

11

The Kims' negligent misrepresentation claim fails for similar reasons. Their evidence was entirely consistent with Forest having installed a working system that subsequently failed due to factors beyond Forest's control. To demonstrate a material issue of fact, the Kims had to show the trial court some possibility that they could establish by clear and convincing evidence at trial that Forest was negligent in communicating the assurance about the drain system to the Kims. Without any evidence establishing the cause of the drain system's failure, the Kims cannot establish that Forest breached any duty of due care when she made the assurance. Without knowing what was wrong with the system, the court could not conclude that, at the time Forest communicated the information, it was unreasonable for her to believe that it was correct.

The Kims have failed to demonstrate any issue as to whether Forest gave them any false information concerning the drainage system. We have held that, "[w]here there is 'a complete failure of proof concerning an essential element of the nonmoving party's case,' all other facts become immaterial and the moving party is entitled to judgment as a matter of law." *Fischer-McReynolds v. Quasim*, 101 Wn. App. 801, 808, 6 P.3d 30 (2000) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). Thus, the trial court did not err in granting Forest summary judgment on the fraud and negligent misrepresentation claims.

B.      Negligent Construction/Breach of Warranty

The Kims attempt to avoid this conclusion by framing the factual dispute as whether Forest "properly installed the drainage system." Br. of Appellant at 11. We agree that Forest's promise to install a drainage system implied that the system installed would function to channel water away from the house's foundation. Whether Forest installed the system properly,

however, presents an issue entirely different from fraud or misrepresentation: if Forest installed a functioning drain system that later failed due to defects in workmanship or materials, the claim instead implicates the construction warranty.

Any claim based on an alleged defect in or negligent construction of the drainage system, however, also fails as a matter of law. The warranty expressly applied to the moisture problem, and by its terms applied only to "defects in the finished construction identified by [the Kims] in writing during the one year" period following the sale. CP 57, 77 ("If within warranty period, crawlspace continues to retain moisture, builder will remedy."). We have upheld similar time limitations on warranties in residential real estate contracts. *Griffith v. Centex Real Estate Corp.*, 93 Wn. App. 202, 210, 969 P.2d 486 (1998); *Southcenter View Condo. Owners' Ass'n v. Condo. Builders, Inc.*, 47 Wn. App. 767, 736 P.2d 1075 (1986). Because the Kims did not notify Forest about the moisture problem in writing within one year of closing, the trial court also did not err in granting summary judgment to Forest as to any claim based on the warranty provision. For this reason, also, the trial court properly granted Forest summary judgment on the Kims' breach of contract claim.

The Kims, however, argue that the one year warranty limitation is invalid because it was a subsequent modification to the Agreement not supported by consideration. We disagree.

The argument appears to rest on the premise that Forest only demanded the warranty limitation after the Kims insisted she address the moisture issue. The record does not support such an assumption. The preprinted form prepared by the Kims' agent and submitted as the original offer states that "[s]eller warrants that all workmanship and materials furnished by it in the construction of the home shall be free from defects for *a period of one (4)* [sic] *year* from the

13

date of substantial completion of the home." CP at 57-58 (emphasis added). The conflicting terms are crossed out in pen, with a handwritten notation specifying that the warranty period is one year. The change is initialed by both parties, on a page bearing Eric Kim's signature, and dated January 26, 2006. The record contains no evidence that the parties had ever agreed to a longer warranty period, and the Kims did not make that claim in their complaint.

Furthermore, the preprinted form contains a number of handwritten modifications that plainly benefit the Kims, such as a $1,000 reduction in the purchase price, establishing that subsequent changes resulted from negotiations supported by mutual consideration. The Kims' argument that the one year warranty provision amounted to a subsequent modification not supported by consideration has no basis in the record.

C.    The Implied Warranty of Habitability

The Kims also allege that the problem with the drain system fell within the implied warranty of habitability, and their remedy is therefore not limited to the negotiated warranty. This argument also fails.

Where a residential builder constructs a new residence and sells it to the first interested buyer, "he impliedly warrants that the foundations supporting it are firm and secure and that the house is structurally safe for the buyer's intended purpose of living in it." *House v. Thornton*, 76 Wn.2d 428, 436, 457 P.2d 199 (1969). The implied warranty covers defects that "have the potential to severely restrict the habitability of the" dwelling, *Atherton*, 115 Wn.2d at 520, amount to "serious structural deficiencies," or "present a substantial risk of future danger." *Westlake View Condo. Ass'n v. Sixth Ave. View Partners, LLC*, 146 Wn. App. 760, 771-72, 193 P.3d 161 (2008). The defects need not, however, render a dwelling completely uninhabitable or

14

actually cause the residents to move out. *Westlake View*, 146 Wn. App. at 771-72; *Lian v. Stalick*, 106 Wn. App. 811, 816, 25 P.3d 467 (2001).

Although "[t]he entire realm of defects which are within the purview of this implied warranty has not been precisely defined," our Supreme Court has specified that "the implied warranty of habitability does not extend to 'mere defects in workmanship' or impose upon a builder-vendor an obligation to construct a perfect residential dwelling." *Atherton*, 115 Wn.2d at 519, 522 (quoting *Stuart v. Coldwell Banker Comm'l Grp., Inc.*, 109 Wn.2d 406, 417, 745 P.2d 1284 (1987)). Whether the implied warranty of habitability applies to a particular defect generally presents a question for the trier of fact. *Burbo v. Harley C. Douglass, Inc.*, 125 Wn. App. 684, 694, 106 P.3d 258 (2005) (noting that the question is "frequently so highly fact-dependent that it is essentially a question of fact to be determined by the jury with careful instructions by the court"). Here, however, the factual issue does not even arise.

First, the Kims did not plead breach of the implied warranty of habitability in their complaint. The complaint contains a cause of action for "breach of contract." CP at 280. We have held that the implied warranty of habitability is an "implied-in-law, non-written term of a contract of sale." *Brickler v. Myers Constr., Inc.*, 92 Wn. App. 269, 275, 966 P.2d 335 (1998) (emphasis omitted); *accord, Burbo*, 125 Wn. App. at 701. The complaint merely alleges on the breach of contract claim that Forest "fail[ed] to meet the conditions *set forth* in the contract." CP at 280 (emphasis added). This limits the claim to breach of terms explicitly appearing in the contract, not a term implied by law. Thus, the Kims did not properly plead the implied warranty claim in the trial court.

15

Second, although the Kims raised the implied warranty of habitability in response to Forest's motion for summary judgment, they presented no evidence to the trial court that the problem with the drainage system amounted to a serious structural defect, presented a substantial risk of future harm, or had the potential to severely restrict the habitability of the dwelling, as the precedents discussed above require. Indeed, the fact that the Kims lived there for more than two years without noticing anything wrong strongly indicates that the problem with the drainage system, if it even existed when the Kims moved in, did not rise to that level.[3]

Finally, the policy considerations that motivated our courts to imply the warranty of habitability in contracts for new residential sales do not apply here. Our Supreme Court has justified the rule on the grounds that the builder is in a better position to know of and prevent possible defects than the buyer, who generally cannot discover such defects by inspecting the completed structure. *House*, 76 Wn.2d at 435-36; *Atherton*, 115 Wn.2d at 521. Here, the Kims had the opportunity to inspect the drainage system prior to completion. As discussed above, the professional inspector the Kims hired told them about a potential problem with the system and explicitly warned them to address it to their satisfaction prior to closing the deal. The Kims raised this concern with Forest and negotiated a specific term in the contract assigning liability for the risk.

---

[3] The years that the Kims lived in the house, without complaining of any moisture problems, included some of the heaviest precipitation ever recorded in southwest Washington, *see* PHILIP MOTE, ET AL., OFFICE OF THE WASHINGTON STATE CLIMATOLOGIST, THE CHEHALIS RIVER FLOOD OF DECEMBER 3-4, 2007, at 2-3, *available at* http://www.climate.washington.edu/events /dec2007floods/OWSC_Chehalis_Dec08_Flood_Report.pdf, a fact of which the trial court seems to have taken judicial notice.

A buyer with actual notice of a defect has a duty to make further inquiries. *Douglas v. Visser*, 173 Wn. App. 823, 830, 295 P.3d 800 (2013). Furthermore, courts will give effect to a waiver of a warranty, even one implied by the law for policy reasons, if it is "explicitly negotiated between buyer and seller and set forth with particularity showing the particular qualities and characteristics" as to which the warranty is waived. *Berg v. Stromme*, 79 Wn.2d 184, 196, 484 P.2d 380 (1971) (involving the warranty of fitness for a particular purpose).

Here, the Kims had notice of a potential problem with the drainage system and either did not investigate further prior to closing or did so and found the issue addressed to their satisfaction. They negotiated a provision in the contract specifically assigning liability for the risk of moisture intrusion in the basement. That provision limited their right to recover from Forest for problems with the drainage system to problems arising within one year of closing.

Assuming, then, that the alleged defect falls within the implied warranty of habitability, the Kims waived any implied warranty claim by knowingly and intelligently negotiating an express warranty covering the particular risk involved. The negotiated warranty limitation period expired before the Kims notified Forest of the moisture intrusion. Thus, had the Kims properly pleaded the implied warranty claim, it would have failed as a matter of law. The trial court did not err in dismissing the claim on summary judgment.

D.    The Independent Duty Doctrine

The Kims argue also that the "economic loss rule" did not limit their remedy to the negotiated warranty. Br. of Appellant at 20. The "economic loss rule," more properly called the "independent duty doctrine," is "'an analytical tool used by the court to maintain the boundary between torts and contract.'" *Elcon Constr.*, 174 Wn.2d at 165 (quoting *Eastwood v. Horse*

17

*Harbor Found., Inc.*, 170 Wn.2d 380, 416, 241 P.3d 1256 (2010) (Chambers, J., concurring).

Under this rule, the plaintiff is limited to the remedy provided by the contract where "the parties'

relationship is governed by contract and the loss claimed is an economic loss," meaning that the

damages alleged consist of the cost of repairing the defective property itself rather than personal

injury or damage to other property. *Alejandre v. Bull*, 159 Wn.2d 674, 686, 153 P.3d 864

(2007).

The Kims apparently mention the rule in response to Forest's argument that the

independent duty doctrine forecloses the Kims' negligent misrepresentation claim.[4] While

Forest's argument on this point may or may not have merit, *see Donatelli v. D.R. Strong*

*Consulting Eng'rs, Inc.*, 179 Wn.2d 84, 97-98, 312 P.3d 620 (2013) (discussing when the

independent duty doctrine bars a negligent misrepresentation claim), the rule has no bearing on

our analysis. The Kims' negligent misrepresentation claim fails regardless of the independent

duty doctrine because, as discussed above, they point to no evidence that Forest gave them any

false information. The trial court did not err in dismissing the negligent misrepresentation claim.

E.      The Discovery Rule

Finally, the Kims argue that, under the discovery rule, the warranty period did not begin

to run until the Kims discovered the water damage. We disagree.

---

[4] The trial court also stated, as an alternative ground for dismissing the fraud and negligent misrepresentation claims, that the "independent duty rule does bar the plaintiffs' tort claim." Verbatim Report of Proceedings (VRP) (Dec. 21, 2012) at 21. With respect to the fraud claim, this appears to misstate the law. *Elcon Constr.*, 174 Wn.2d at 165-66 ("Even in the real property context, where we have been the least hesitant to apply the [independent duty] doctrine, we have repeatedly recognized a fraud claim to be outside the doctrine's scope, allowing such claims to be decided based on established tort precedent."). Because the trial court properly ruled that the fraud claim fails for lack of evidence of any false statement of existing fact, the misunderstanding concerning the independent duty doctrine is immaterial.

The discovery rule applies to "construction contract claims involving latent construction defects," *1000 Virginia Ltd. Partnership v. Vertecs Corp.*, 158 Wn.2d 566, 578-79, 146 P.3d 423 (2006), and provides that "a cause of action accrues when a plaintiff discovers, or in the exercise of reasonable diligence, should have discovered, the elements of the cause of action," *Stuart*, 109 Wn.2d at 415 (emphasis omitted). "A latent defect is one which could not have been discovered by inspection." *Arrow Transp. Co. v. A. O. Smith Co.*, 75 Wn.2d 843, 851, 454 P.2d 387 (1969). However, "a plaintiff cannot ignore notice of possible defects," and "[a] person who has notice of facts that are sufficient to put him or her upon inquiry notice is deemed to have notice of all facts that reasonable inquiry would disclose." *Vertecs Corp.*, 158 Wn.2d at 581.

Here, the Kims fail to explain why they could not have inspected the drainage system before Forest buried it, or afterward in the same manner that Forest's experts did.[5] As discussed, the Kims had actual notice of a potential problem with the drainage system, and their own inspector advised them in no uncertain terms to investigate further prior to closing. If the defect detected in the system in fact existed when the Kims bought the house, they would have discovered the problem had they conducted a reasonable investigation. Thus, the defect was not "latent" and the discovery rule does not apply.

### III. CR 11 SANCTIONS

The Kims also argue that the trial court erred in imposing CR 11 sanctions against their attorney. We decline to reach the issue.

---

[5] The plumber Forest hired to diagnose the problem with the drain system charged $225.72, and estimated that it would cost $765.95 to dig up the plugged line and clear it.

A court rule specifies that "[o]nly an aggrieved party may seek review by the appellate court." RAP 3.1. The client of an attorney against whom a court imposes sanctions is not aggrieved by the sanctions and thus may not appeal them: the attorney must appeal the sanctions on his or her own behalf. *Engstrom v. Goodman*, 166 Wn. App. 905, 917, 271 P.3d 959, *review denied*, 175 Wn.2d 1004 (2012); *accord Breda v. B.P.O. Elks Lake City 1800 SO–620*, 120 Wn. App. 351, 353, 90 P.3d 1079 (2004).

The imposition of sanctions against their attorney did not aggrieve the Kims. On the contrary, it benefitted them: their attorney will have to pay a substantial portion of Forest's fees in their stead. Because the Kims' attorney has not separately appealed, the CR 11 sanctions issue is not properly before us. We decline to address the matter further.

## IV. ATTORNEY FEES

Forest requests attorney fees on appeal. The Agreement provides that "[i]f buyer or seller institutes suit against the other concerning this Agreement, the prevailing party is entitled to reasonable attorneys' fees and expenses." CP at 36. When a contract provides for a fee award in the trial court, the party prevailing before us may seek reasonable costs and attorney fees incurred on appeal. RAP 18.1; *Reeves v. McClain*, 56 Wn. App. 301, 311, 783 P.2d 606 (1989). Forest prevails here and has complied with the procedural requirements. We therefore award Forest the reasonable costs and attorney fees she incurred in this appeal.

Forest also asks us to impose further sanctions on the Kims' attorney under RAP 18.9(a). The rule gives us discretion to "order a party or counsel . . . who uses these rules for the purpose of delay, files a frivolous appeal, or fails to comply with these rules to pay terms or

20

compensatory damages to" the party harmed. RAP 18.9(a). Applying this rule, we have held that

> [i]n determining whether an appeal is frivolous and was, therefore, brought for the purpose of delay, justifying the imposition of terms and compensatory damages, we are guided by the following considerations: (1) A civil appellant has a right to appeal under RAP 2.2; (2) all doubts as to whether the appeal is frivolous should be resolved in favor of the appellant; (3) the record should be considered as a whole; (4) an appeal that is affirmed simply because the arguments are rejected is not frivolous; (5) an appeal is frivolous if there are no debatable issues upon which reasonable minds might differ, and it is so totally devoid of merit that there was no reasonable possibility of reversal.

*Streater v. White*, 26 Wn. App. 430, 434-35, 613 P.2d 187 (1980). Although we disagree with the Kims' arguments, it is at least doubtful whether they are "so totally devoid of merit that there was no reasonable possibility of reversal." *Streater*, 26 Wn. App. at 435. Following *Streater* and resolving all doubts in favor of the Kims, we deny Forest's sanction request.

## CONCLUSION

The trial court properly granted Forest's motion for summary judgment as to the Kims' fraud, negligent misrepresentation, and breach of contract claims. To the extent the Kims claimed breach of the implied warranty of habitability, the court properly granted summary judgment to Forest on that claim also.

We award Forest costs and attorney fees on appeal pursuant to the Agreement, but decline to impose further sanctions against the Kims' attorney. We also decline to address the Kims' claims concerning the trial court's imposition of CR 11 sanctions because they are not "aggrieved" by the imposition of sanctions against their attorney.

We thus affirm the trial court in all respects.

No. 44430-5-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_Bjorgen_, A.C.J.

BJORGEN, A.C.J.

We concur:

_Maxa_, J.

MAXA, J.

_Lee_, J.

LEE, J.